# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-23-00633-CR

---

**Cequil Shaq Clemons, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 264TH DISTRICT COURT OF BELL COUNTY
NO. 82094, THE HONORABLE PAUL L. LEPAK, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant Cequil Shaq Clemons pleaded guilty to the offense of racing on a highway causing serious bodily injury, a second-degree felony. *See* Tex. Transp. Code § 545.420(h). The district court sentenced Clemons to ten years' imprisonment.

Clemons's court-appointed counsel on appeal has filed a motion to withdraw and a brief pursuant to *Anders v. California*, 386 U.S. 738, 744 (1967). The brief meets the requirements of *Anders* by presenting a professional evaluation of the record demonstrating why there are no arguable grounds to be advanced. *See id.* at 744-45; *see also Penson v. Ohio*, 488 U.S. 75, 81–82 (1988); *Garner v. State*, 300 S.W.3d 763, 766 (Tex. Crim. App. 2009). Counsel has certified to this Court that he has provided Clemons with a copy of the motion and brief, advised him of his right to examine the appellate record and file a pro se response, and supplied him with a form motion for pro se access to the appellate record. *See Kelly v. State*, 436 S.W.3d 313, 319-20 (Tex. Crim. App. 2014). No pro se brief has been filed.

Upon receiving an *Anders* brief, we must conduct a full examination of the record to determine whether the appeal is wholly frivolous. *See Penson*, 488 U.S. at 80; *Bledsoe v. State*, 178 S.W.3d 824, 826–27 (Tex. Crim. App. 2005); *Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991). The record reflects that the State charged Clemons with intentionally or knowingly participating in a vehicle speed competition or a race that resulted in serious bodily injury or death. Clemons pleaded guilty to committing the offense, and the case proceeded to a hearing on punishment.

At the hearing, several witnesses testified to the circumstances of the offense. Officer Mattias Smith of the Killeen Police Department testified that on the night of February 28, 2020, he was dispatched to the scene of a serious automobile collision at an intersection. Smith described the scene upon his arrival as "a vehicular war zone at that point. Cars everywhere, fluids were all over the place, car parts were all over the place. People just everywhere. I mean, it was chaos at that point once I got on scene." There were three vehicles involved in the collision, a Dodge Charger driven by Clemons, a Dodge Journey containing two adults and five children, including an infant, and a black Mercedes occupied by a husband and wife who did not sustain serious injuries. Both the Charger and the Journey had extensive damage, and the Journey "was actually pinned up against the traffic signal light pole on the northeast corner of the intersection." The adults in the Journey "had to be cut out of the vehicle" using the Jaws of Life "because there was so much damage to the doors, they couldn't open the doors." The damage to the Journey was so extensive that Smith did not think that the adult occupants would survive. He recalled, "[T]here was injuries that I saw that I never thought I would have seen at an accident, and somebody still be alive."

Smith described the crash between the Charger and the Journey as a T-bone collision, with "so much momentum involved in the accident that when they collided inside the middle of the intersection, the momentum from the Charger it actually – it was transferred over to the Journey," causing the Journey to further collide with the traffic-light pole. Smith observed blood on the pole, which he later learned was from the Journey driver's face hitting the pole upon impact. The speed limit at the location of the collision was 40 miles per hour. Smith testified that based on data obtained from the Charger's black box, the Charger was driving 93 miles per hour five seconds before impact with the Journey, 98 miles per hour four seconds before impact, 101 miles per hour three seconds before impact, and 103 miles per hour two-and-a-half seconds before impact. Immediately after that, the vehicle decelerated quickly, and at the moment of impact, the Charger was driving at 74 miles per hour.

Deanna Contreras testified that she was driving behind the Charger and the Mercedes when the collision occurred and that she observed the two vehicles "street racing" each other. She recounted that both vehicles passed her on the road as they approached the intersection, that they drove side by side at the same speed, and that they accelerated at the same time. Contreras explained, "The speed limit was 40. I was going about 35 at that particular time. And the acceleration was clear." She added that she knew the vehicles were racing "by the sound that the cars were making" and "how the wheels were spinning." After Contreras saw the Charger collide with the Journey, she pulled over and ran to the scene to help the injured.

A second witness to the collision, Cheyenne Tweedy, testified that she saw the Charger collide with the Journey, causing the Journey to spin in "donuts from the impact," barely miss her vehicle while spinning, and hit the traffic-light pole. Tweedy recounted that the

3

Charger had "been speeding at high speeds. I don't know what speed, but like I said, it was very—it came out of nowhere and just hit the SUV."

Robert Garza testified that he was driving the Journey that was hit by the Charger. He recounted that his former girlfriend and five children (two belonging to Garza, two belonging to his girlfriend, and a neighbor's daughter) were also in the vehicle at the time of the collision. Garza described the nature and extent of his injuries. He suffered a fractured right arm and damage to his intestines, both of which required surgery. He also sustained an injury to his face from hitting the pole, and he remembered blood "gushing from my nose all over my beard, and all over my clothes." Garza was in the hospital for approximately one week.

Garza's former girlfriend, Ilia Fuentes, suffered a traumatic brain injury and underwent neck, hip, and leg surgery following the collision. She was in the hospital for approximately four months. Fuentes testified that she suffered memory loss and numbness on the right side of her body resulting from her injuries and now needs to walk with a cane. She also suffered vision damage and now wears an eye patch to avoid double vision. As a result of the collision, Fuentes is disabled, is no longer able to work as a dental assistant, and needs physical help raising her children.

Fuentes's sister, Joanna Traverzo, testified in more detail about the nature and extent of Fuentes's injuries. She recounted that when she went to the hospital on the night of the collision, the doctors told her that Fuentes had "fractured her spine, the vertebrae that's in between her neck and head, one of those vertebras had broken. And basically they were trying to put her back together. She had broken her hip. She broke her right leg." Traverzo went on to describe the surgeries and prolonged recovery process that Fuentes endured, including that she

4

had to be placed in an induced coma for a month "because of all the surgeries it was just too much pain for her to come out of it."

Two witnesses testified on behalf of Clemons. Makayla Edgar, Clemons's wife, who met him after the collision, testified that Clemons disclosed to her that he committed the offense and told her "of his remorse over the situation." She testified that Clemons was "very kind and gentle and he's loving and funny. And he would give his last to anybody that needed it." Joshua Beatty, Clemons's stepbrother, testified that he was certain that Clemons "feels bad about the injuries that he caused to that family." Both Edgar and Beatty testified that they believed probation would be an appropriate punishment for Clemons.

At the conclusion of trial, the district court sentenced Clemons to ten years' imprisonment as noted above. This appeal followed.

We have reviewed the record and counsel's brief. We agree with counsel that the appeal is frivolous. We find nothing in the record that might arguably support the appeal. We affirm the judgment of conviction and grant counsel's motion to withdraw.

_____

Gisela D. Triana, Justice

Before Justices Triana, Theofanis, and Crump

Affirmed

Filed:  September 25, 2025

Do Not Publish